Henry **BARLOW, Mark Barlow, and Hyrum Barlow, Plaintiffs,**

v.

**Neal B. EVANS and Barbara H. Evans, Defendants.**

**No. 96–CV–0953B.**

United States District Court, D. Utah, Central Division.

June 16, 1997.

Vincent C. Rampton, Salt Lake City, UT, for Plaintiffs.

Serman C. Young, Provo, UT, for Defendants.

## MEMORANDUM DECISION AND ORDER

BENSON, District Judge.

Plaintiffs Henry, Mark, and Hyrum Barlow initiated this action against defendants Neal and Barbara Evans for their refusal to perform an agreement to sell real property located in Lehi, Utah. The Barlows claim that because the Evans' refusal was based upon the belief, mistaken or otherwise, that the Barlows were polygamists, it is in violation of the Federal Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a), which forbids a refusal to sell real estate "because ... of religion." The Barlows also assert various state causes of action, but their FHA claim is the only cause of action based on federal law.

Currently before the court is the Evans' motion to dismiss for want of federal jurisdiction pursuant to Rule 12(b)(1) and motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Having reviewed the memoranda submitted by the parties, being fully apprised, and for good cause appearing, the court issues the following memorandum decision and order.

## BACKGROUND

On or about April 25, 1996, the Barlows entered into a Real Estate Purchase Contract with the Evans under the terms of which the Barlows agreed to purchase, and the Evans agreed to sell the subject property. The transaction was entered into under the terms and conditions set out in the contract for a purchase price of $468,070.00. Under the terms of the contract, the Barlows were to purchase the subject property from the Evans upon approval by Utah County of a proposed seven-lot subdivision, four of the seven lots to be located on the subject property. The Barlows intended to use this property to build homes for themselves and their families.

After execution of the contract, the parties agreed between themselves that, due to time constraints and by virtue of procedures utilized by the Utah County Planning and Zoning office, approval of the seven-lot subdivision (including the four lots on the subject property), would be sought in two phases: a five-lot subdivision (two lots on the subject property), followed by a two-lot subdivision (both on the subject property).

The Barlows acted on the contract, securing engineering drawings of the subject property, obtaining a survey thereof, securing water rights, obtaining well permits, arranging for bonding for a roadway into the property (of which the Evans agreed to pay half, under the terms of the contract), and otherwise pursuing subdivision plat approval. Utah County gave preliminary plat approval to the parties' submittal on the five-lot portion of the subdivision.

On two occasions during the subdivision approval process described above, the Evans inquired whether the Barlows were polygamists, to which the Barlows responded that they were not.[1] At that time, the Evans gave no indication that they considered the question relevant to their performance under the contract.

In subsequent communications, the Evans notified the Barlows that, because they believed the Barlows to be polygamists, they did not intend to sell the subject property to them. Henry Barlow retorted that the Evans' beliefs concerning his family's religious affiliation did not excuse the Evans' performance of the contract. Nevertheless, the Evans refused to sell the subject property to the Barlows.

At or about the same time, Neal B. Evans contacted the Utah County Planning and Zoning office, and directed that it take no further action to approve either the preliminarily-approved five-lot subdivision, or the remaining two-lot subdivision, submitted by the parties.

## DISCUSSION

The Federal Fair Housing Act provides in pertinent part as follows:

[I]t shall be unlawful ... to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

The Evans argue that the FHA is inapplicable because polygamy is not entitled to a protected status. The argument continues that if the Barlows are not entitled to protection under the FHA, they lack standing to bring this action in federal court, have failed to state a claim, and have failed to plead a prima facie case under the Act. The Barlows oppose the Evans' motion to dismiss on the basis that the Evans' refusal to sell to them was motivated by a religious discriminatory purpose. It follows, the Barlows argue, that they therefore qualify as members of a "protected class" intended to benefit under the

FHA and have established a prima facia case of disparate treatment. In this instance, the court must regard as true all factual allegations set out in the complaint and grant the Evans' motion to dismiss for lack of subject matter jurisdiction only if the facts, as plead, fail to make a prima facia case under the FHA.

■ In order to establish a prima facia case, the Barlows must first establish that they are members of a class of persons intended to be protected under the FHA. *Mountain Side Mobile Estates v. Secretary of HUD*, 56 F.3d 1243, 1251 (10th Cir.1995). A person is a member of a protected class, for the purposes of the Act, when "they are the direct object of the statutory protection." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503 (10th Cir.1995). In the Barlows' complaint, they allege as follows:

22. Defendant's refusal to sell the Subject Property to plaintiffs due to defendants' belief that plaintiffs practice polygamy as a religious observance, under the circumstances set out above, constitutes refusal to sell, after the making of a bona fide offer, dwellings to plaintiffs because of religion, in violation of the Federal Fair Housing Act, 42 USC § 3604(a).

23. By reason and as a direct result of said violation, plaintiffs have been denied the acquisition of the subject property.

Compl. at ¶¶ 22–23.

■ Assuming arguendo that the allegations of the complaint are true, the Evans have refused to sell because of the Barlows' perceived religious practice, an apparent violation of the FHA. The issue then is whether there is something about the practice of polygamy that makes the Evans' alleged discriminatory conduct not violative of the Act. There is nothing in the FHA itself to give the court direct guidance. "Religion" or religious practices are not defined nor are there explicit exceptions to the protected categories. The plain language of the FHA simply states that a sale of real property may not be refused "because of ... religion." And that, of course, is exactly what is alleged here.

---

1. While the Barlows claim not to be polygamists, they acknowledge that they "are descended from, and closely related to, individuals who practice polygamy as a religious observance." Compl. ¶ 17.

■ The court recognizes its task is to apply the FHA consistent with Congressional intent. Normally the plain language of the statute prevails, and that is especially true where the language is clear and unambiguous, as the language of the FHA appears to be on initial examination. Nevertheless, the court should not be blind to the implicit meaning of the terms of the statute which may be refined because of the FHA's obvious interplay with other state and federal statutory laws, both criminal and civil.

In the instant case, there is no question that polygamy is against the criminal code of Utah.[2] The Evans therefore contend that it cannot be a violation of the FHA to refuse to sell real estate to a person because the seller believes the buyer is a practicing polygamist. They also point to *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878), where the Supreme Court held that the prohibition of polygamy does not violate the free exercise clause of the First Amendment. *Id.* at 162; *see also Potter v. Murray City,* 760 F.2d 1065, 1070 (10th Cir.) (holding that terminating a police officer because he practiced polygamy did not violate his right to free exercise of religion or his right to privacy), *cert. denied,* 474 U.S. 879, 106 S.Ct. 201, 88 L.Ed.2d 170 (1985). Obviously, however, just because a practice is not entitled to First Amendment protection does not mean it lacks status as a genuine "religious" practice. And, there is nothing in the FHA itself that limits the reach of the Act to religious practices that are protected under the free exercise clause of the First Amendment.

■ The question is thus defined. Does the FHA reach discrimination against a religious practice that is against the criminal code and not entitled to First Amendment protection? This case is specifically pled in these terms. The Barlows contend they were discriminated against because the Evans believed the Barlows were "practicing polygamy." This would be a different case if the Evans were alleged to have discriminated against the Barlows on the basis of the Barlows' alleged religious *belief* in the practice of polygamy. Neither *Reynolds* nor any law this court is aware of has ever prohibited a *belief* in polygamy as a religious tenet, as opposed to the *practice* of polygamy. If the discrimination were based solely on the Barlows' religious beliefs, the statute would appear to be violated. But here the allegation goes to the practice of polygamy, which is unquestionably unlawful.

This case could also be analyzed differently if the Evans had taken a firm position throughout that their reason for refusing to sell to the Barlows was because the Barlows were committing illegal acts, with no reference whatsoever to religion. In that event the refusal would not be "because of ... religion" and the Act would be inapposite. But again that is not this case. Here the Evans' decision not to sell was allegedly because the Evans disagreed with, and disapproved of, the religious practice of polygamy.

The court believes that Congress did not intend for the FHA to require citizen sellers of real estate to deal with lawbreakers, or perceived lawbreakers, even if the lawbreaking activity is based on a genuine religious belief. Common sense and practicality require such a result. Surely in its effort to provide fair housing to all Americans, Congress did not intend to aid and abet criminal behavior. There is nothing in the Act or its history that suggests such a reach. Such an interpretation would require sales of houses that sellers know (or strongly suspect) are to be used as drug houses, brothels, or even altars for human sacrifices, if such criminal practices were engaged in as part of the buyers' religious beliefs.

In drafting the FHA, Congress could have clarified a limitation on the meaning of "religion," but it did not. This case would be easier to decide if it had. Nevertheless, on balance, the court feels that it is necessary in this instance to recognize a limitation implicit in the FHA that does not require the FHA to condone criminal behavior. The opposite result is untenable. The only way to harmonize the FHA with the criminal law is to recognize such a common sense limitation on the reach of the Act.

---

2. Article III of the Utah Constitution prohibits polygamy and Utah Code Ann. § 76–7–101 renders polygamy a felony. Indeed, it is fair to state that Utah would not have been granted statehood in 1896 if it had not first renounced and made illegal the practice of polygamy.

This is especially true where the activity in question—the practice of polygamy—has been determined by the highest court of the land not to be entitled to free exercise protection under the First Amendment. Again, this does not mean polygamy is not a genuine religious belief or practice, but the *Reynolds* case underscores the fact that the Supreme Court reached its decision in that case by finding the practice of polygamy to be one of those rare religious practices that is contrary to the interests of society and undeserving of constitutional protection. It would be remarkable in the extreme if the same government finds a religious practice undeserving of constitutional protection under the First Amendment, yet deserving of protected status under the FHA.

The Illinois Court of Appeals addressed a similar issue in *Mister v. A.R.K. Partnership*, 197 Ill.App.3d 105, 143 Ill.Dec. 166, 553 N.E.2d 1152 (1990). In *Mister* the defendants appealed a temporary restraining order prohibiting them from renting two of their apartments to any persons beside plaintiffs pending plaintiffs' separate civil rights action against defendants before the Illinois Human Rights Commission. Plaintiffs were two unmarried couples. Defendants were owners and managers of certain rental apartments and had a company policy of not renting to unmarried couples. It was undisputed that plaintiffs were "ready, willing and able to move into" the apartments and that defendants would have rented to plaintiffs if they were married. *Id.* at 1154. The Human Rights Act in question prohibited discrimination in real estate transactions on the basis of sex or marital status, exactly what was alleged.

The court "examine[d] the public policies embodied in the criminal prohibition against fornication ... and the statutory renouncement of common-law marriages" and determined that the legislature had clearly expressed a "policy disfavoring private alternatives to marriage." *Id.* at 1157, 1158. The court held that interpreting the

Human Rights Act to offer heightened protections to conduct expressly disfavored and criminally prohibited would be "patently incongruous" to legislative intent. Accordingly, the court ruled that plaintiffs were not protected by the Act. *See also Peabody Properties Inc. v. Sherman,* 418 Mass. 603, 638 N.E.2d 906 (1994) (holding that although a tenant satisfied the handicapped requirement of the FHA, he could not contest an eviction under the FHA because he sold illegal drugs on his property).

There may come a time when the legal standard applicable to the practice of polygamy may change.[3] If that happens, the result here may be different, but it is not for this court to question clearly established public policies. Therefore, under the present state of the law, the court finds that the term "religion" in the FHA does not include religious practices that are both against the criminal law and not entitled to First Amendment protection.

## CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' motion to dismiss for failure to state a claim and lack of jurisdiction is GRANTED.

---

**3.** The recently enacted Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb–1 to –4 ("RFRA") may suggest the possibility of such a change. Under RFRA a state law "shall not substantially burden a person's exercise of religion" unless the state can show that it has a "compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest." *Id.* at § 2000bb–1. RFRA, however, is not involved in this case, having not been raised as an issue by either party.